UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALASSIS COMMUNICATIONS, INC.,

                 Plaintiff,

v.

NEWS CORPORATION; NEWS AMERICA MARKETING, a/k/a NEWS AMERICA INC., a/k/a NEWS AMERICA MARKETING GROUP; NEWS AMERICA MARKETING FSI, LLC, a/k/a NEWS AMERICA MARKETING FSI, INC.; and NEWS AMERICA MARKETING IN-STORE SERVICES, LLC, a/k/a NEWS AMERICA MARKETING IN-STORE SERVICES, INC.

                 Defendants.

Case No. 2:13-cv-14654

Hon. Arthur J. Tarnow

**<ins>PLAINTIFF'S RESPONSE TO MOTION TO DISMISS</ins>**

| | |
|---|---|
| A. Michael Palizzi (P47262) | Kenneth A. Gallo (N.Y. Bar No. 4430369) |
| Thomas W. Cranmer (P25252) | |
| Larry J. Saylor (P28165) | Jane B. O'Brien (N.Y. Bar No. 4484457) |
| Kimberly L. Scott (P69706) | PAUL, WEISS, RIFKIND, WHARTON |
| MILLER CANFIELD PADDOCK | & GARRISON, LLP |
| and STONE, P.L.C. | 2001 K Street, NW |
| 150 W. Jefferson, Suite 2500 | Washington, D.C. 20006-1047 |
| Detroit, MI 48226 | (202) 223-7300 |
| (313) 496-8454 | kgallo@paulweiss.com |
| palizzi@millercanfield.com | jobrien@paulweiss.com |
| cranmer@millercanfield.com | |
| saylor@millercanfield.com | |
| scott@millercanfield.com | |

David Mendelson (P53572)
THE MENDELSON LAW FIRM, PC
355 S. Old Woodward Ave., Ste. 100
Birmingham, MI 48009
(248) 646-8277
dm@mendelsonlaw.net

*Attorneys for Plaintiff*

David F. DuMouchel (P25658)
Robin Luce Herrmann (P46880)
Joseph E. Richotte (P70902)
BUTZEL LONG
150 W. Jefferson Ave., Ste. 100
Detroit, MI 48226
(313) 225-7004
dumouchd@butzel.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

ISSUES PRESENTED....................................................................... vii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ix

INTRODUCTION ................................................................................1

STATEMENT OF FACTS .....................................................................2

    I.    THE ISP AND FSI ARE IN SEPARATE RELEVANT
         MARKETS. ...........................................................................2

    II.    NEWS' ANTICOMPETITIVE CONDUCT IN THE ISP
         MARKET. ...........................................................................3

         A.    News' Tactics with Retailers...................................4

         B.    News' Tactics with CPGs. ......................................5

         C.    News' Other Anticompetitive Tactics. ....................6

    III.    NEWS' ATTEMPT TO MONOPOLIZE AND RESTRAIN
         TRADE IN THE FSI MARKET. .............................................6

    IV.    NEWS' ONGOING ANTICOMPETITIVE CONDUCT
         HARMS COMPETITION AND MUST BE STOPPED ONCE
         AND FOR ALL. ..................................................................8

LEGAL STANDARD............................................................................9

ARGUMENT.....................................................................................10

    I.    VALASSIS SUFFICIENTLY DEFINES THE RELEVANT
         ISP AND FSI MARKETS AND PLAUSIBLY ALLEGES
         NEWS POSSESSES MONOPOLY POWER IN THE ISP
         MARKET. .........................................................................13

         A.    Valassis Alleges Plausible FSI and ISP Markets. ...................14

         B.    News Possesses a Monopoly in the Relevant ISP Market. .....15

    II.    NEWS' USE OF LONG-TERM, EXCLUSIVE CONTRACTS
         LESSENS COMPETITION AND UNREASONABLY
         RESTRAINS TRADE. .........................................................16

         A.    News' Long-Term, Exclusive ISP Contracts Are
            Anticompetitive. ..................................................19

## TABLE OF CONTENTS
(continued)

Page

B.     News' Exclusive Dealing Arrangements Substantially
Restrain Trade in the FSI Market. ...........................................23

C.     News' Reliance on NicSand is Unavailing. ............................23

III.   NEWS UNLAWFULLY WIELDS MONOPOLY POWER
AND SIGNIFICANTLY RESTRAINS TRADE IN THE ISP
MARKET USING PREDATORY PRICING. ..................................26

IV.    NEWS USES OTHER ANTICOMPETITIVE CONDUCT TO
MAINTAIN ITS MONOPOLY IN THE ISP MARKET. ...............29

V.     VALASSIS SUFFICIENTLY STATES A CLAIM FOR
ATTEMPTED MONOPOLIZATION OF THE FSI MARKET. ......30

A.     Valassis Alleges Anticompetitive Conduct. ...........................31

B.     Valassis Alleges Specific Intent to Monopolize. ...................32

C.     Valassis Alleges a Dangerous Probability of Success............32

D.     News' Request for "Presumptions" Contradicting
Valassis' Factual Allegations is Groundless..........................33

VI.    VALASSIS STATES VALID BUNDLING AND TYING
CLAIMS. .......................................................................................35

A.     Valassis States a Plausible Claim for Bundling Under the
Court's Order.........................................................................36

B.     Valassis States a Plausible Claim for Tying Under the
Court's Order.........................................................................38

C.     The Order Does Not Require Dismissal or Stay. ...................41

VII.   VALASSIS SUFFICIENTLY ALLEGES ANTITRUST
INJURY.........................................................................................44

VIII.  NEWS MISREADS THE SETTLEMENT AGREEMENT. ............46

IX.    ALTERNATIVELY, VALASSIS REQUESTS LEAVE TO
AMEND THE COMPLAINT. ........................................................49

CONCLUSION ................................................................................50

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995) ...........22

*Allen v. Dairy Farmers of Am. Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010)..........28, 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................................9

*Bank of Am., N.A. v. Corporex Realty & Inv.,*
*LLC*, 875 F. Supp. 2d 689 (E.D. Ky. 2012) ......................................................47

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983) .............22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................9, 10

*Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123 (6th Cir. 1981).........................40

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ........ix, 33, 34, 37

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993).............................................................................26, 27, 28

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002).................................................... ix, 12, 13, 30, 46

*Cotton v. City of Franklin*, 494 F. App'x 518 (6th Cir. 2012) ..............................48

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011)........9

*E.I. Du Pont de Nemours and Co. v. Kolon Industries, Inc.,*
637 F.3d 435 (4th Cir. 2011) ("*DuPont*")...................................................*passim*

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .................12

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981) ...............22

*Foman v. Davis*, 371 U.S. 178 (1962). .................................................................49

*Foundation for Int. Design v. Savannah College,*
244 F.3d 521 (6th Cir. 2001)......................................................................40, 41

*GMA Cover Corp. v. Saab Barracuda LLC*,
No. 10-12060, 2012 WL 642739 (E.D. Mich. Feb. 8, 2012) ...........................29

*Hailes v. Free*, No. 12-00687, 2012 WL 5988726 (S.D. Ohio Nov. 29, 2012) ......16

*In re Mushroom Direct Purchaser Antitrust Litig.*,
514 F. Supp. 2d 683 (E.D. Pa. 2007)...............................................................15

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010) ...........................................ix, 9, 10, 16

*In re Pool Prods. Distrib. Market Antitrust Litig.*,
940 F. Supp. 2d 367 (E.D. La. 2013)...............................................................33

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)....................................................21, ix

*In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014) .......ix, 44, 45

*In re Static Random Access Memory Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008)..............................................................43

*Invacare Corp. v. Respironics, Inc.*,
No. 04-1580, 2006 WL 3022968 (N.D. Ohio Oct. 23, 2006)...........................37

*M&M Med. Supplies & Serv. v. Pleasant Valley Hosp.*,
981 F.2d 160 (4th Cir. 1992)....................................................................31, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............29

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*,
161 F.3d 443 (7th Cir. 1998)...........................................................................48

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004)...........................................................................22

*Moore v. James H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977)....................39

*Morse v. McWhorter*, 290 F.3d 795 (6th Cir. 2002) ...............................................50

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) ...................... 23, 24, 25, 26

*Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*,
604 F.3d 1291 (11th Cir. 2010).......................................................................45

*Rock v. Nat'l Collegiate Athl. Ass'n*, 928 F. Supp. 2d 1010 (S.D. Ind. 2013) ........11

*Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673 (6th Cir. 2011)...............ix, 47

*Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417 (6th Cir. 2000).................50

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)...................ix, 31, 32, 33

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) .......................34

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
__ F. Supp. 2d __, 2013 WL 3991798 (D. Kan. 2013) ....................................45

*Synergistics USA, Inc. v. Alcon Labs., Inc.*,
No. 08-3669, 2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) ..............................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................9

*Twin City Sportservice, Inc. v. Finley & Co., Inc.*,
676 F.2d 1291 (9th Cir. 1982).......................................................................12

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001).........................................................................34

*Watkins & Sons Pet Supplies v. Iams Co.*,
107 F. Supp. 2d 883 (S.D. Ohio 1999) ..........................................................11

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F.3d 452 (6th Cir. 2011)................................................. ix, 9, 10, 11, 48, 49

*Whatman, Inc. v. Davin*,
No. 08-2103, 2009 WL 6323200 (D.S.C. Dec. 15, 2009).....................21, 22, 28

*White & White v. Am. Hosp. Supply Corp.*, 723 F.2d 495 (6th Cir. 1983) .............32

*White Mule Co. v. ATC Leasing Co. LLC*,
540 F. Supp. 2d 869 (N.D. Ohio 2008) ....................................................15, 16

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) .............47

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3rd Cir. 2012) ....................*passim*

**STATUTES**

Federal Rule of Civil Procedure 8(a)(2) .................................................ix, 9, 21, 28

Federal Rule of Civil Procedure 8(c)(1) ..................................................................47

Federal Rule of Civil Procedure 12(b)(6) ..........................................................*passim*

Sherman Act §§ 1-2 and Clayton Act § 3 ........................................................11, 26

**OTHER AUTHORITIES**

Areeda & Hovenkamp, Antitrust Law (3d ed. 2008)............................................34

## ISSUES PRESENTED

I.     Whether Valassis has stated antitrust claims based on exclusive dealing arrangements where it alleges, based on information from retailers, consumer-packaged goods manufacturers, and News' shareholders, that since 2010, News has used long-term, exclusive contracts with strict anticompetitive terms to substantially foreclose competition in the market for in-store promotions, thereby harming competition and Valassis?

Valassis Answers: Yes

II.    Whether Valassis has stated antitrust claims based on predatory pricing where it alleges, based on information from retailers, that since 2010, News' in-store promotions prices are below an appropriate measure of costs, and that News will recoup its investment once Valassis is forced to exit the in-store promotions market?

Valassis Answers: Yes

III.   Whether Valassis has stated a claim for attempted monopolization where it alleges based on information from retailers and consumer-packaged goods manufacturers, that since 2010, News has used anticompetitive contracts and predatory pricing with the specific intent to increase its near-monopoly position in the free-standing insert market?

Valassis Answers: Yes

IV.    Whether Valassis has stated a claim for bundling under the Court's June 15, 2011 Order where it alleges, based on an analysis of costs and information from consumer-packaged goods manufacturers, that News' bundled discounts cause the price of its free-standing inserts to be below their incremental cost and to reduce competition in the free-standing insert market?

Valassis Answers: Yes

V.     Whether Valassis has stated a claim for tying under the Court's June 15, 2011 Order where it alleges, based on information from consumer-packaged goods manufacturers, that since 2010, News has continued to leverage its position in the in-store promotions market to coerce an appreciable number of consumer-packaged goods companies to accept its tie, thereby affecting a significant volume of commerce in the free-standing insert market?

Valassis Answers: Yes

VI.    Whether the parties' February 4, 2010 settlement agreement affects the legal sufficiency of Valassis' allegations where the settlement agreement is outside of the pleadings, and the release otherwise does not bar the use of facts existing prior to the date of the release to support claims that accrued after the date the release was executed?

Valassis Answers: No

VII.   Whether, as an alternative, the Court should permit Valassis to amend its Complaint if the Court grants any part of News' motion where Valassis will amend without delay, prejudice would not exist at this early stage of litigation, and News has not shown that correcting perceived deficiencies as to when allegations occurred would be futile?

Valassis Answers: Yes

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

1.    Fed. R. Civ. P. 8(a)(2)

2.    Order, *Valassis Comm'ns v. News Am., Inc.*,
        No. 06-10240, Dkt. #412 (June 15, 2011)

3.    *Spectrum Sports, Inc. v. McQuillan*,
        506 U.S. 447, 456 (1993)

4.    *In re Southeastern Milk Antitrust Litig.*,
        739 F.3d 262, 284 (6th Cir. 2014)

5.    *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*,
        648 F.3d 452 (6th Cir. 2011)

6.    *Rondigo, L.L.C. v. Twp. of Richmond*,
        641 F.3d 673 (6th Cir. 2011)

7.    *Conwood Co., L.P. v. U.S. Tobacco Co.*,
        290 F.3d 768 (6th Cir. 2002)

8.    *ZF Meritor, LLC v. Eaton Corp.*,
        696 F.3d 254 (3rd Cir. 2012)

9.    *E.I. Du Pont de Nemours and Co. v. Kolon Industries, Inc.*,
        637 F.3d 435 (4th Cir. 2011)

10.    *Broadcom Corp. v. Qualcomm Inc.*,
        501 F.3d 297 (3d Cir. 2007)

11.    *In re Packaged Ice Antitrust Litig.*,
        723 F. Supp. 2d 987 (E.D. Mich. 2010)

# **INTRODUCTION**

Sometimes even a $300 million jury verdict isn't enough to convince a monopolist to change its anticompetitive ways. News,[1] the monopolist here, has treated the $300 million jury verdict and subsequent $500 million settlement with Plaintiff Valassis Communications, Inc. as a *license* to continue and expand its anticompetitive practices. Valassis brings this action to halt News' anticompetitive conduct.

Valassis' Complaint describes with detail News' ongoing-multi-front war on competition, using predatory cash payments, long-term exclusive contracts with highly restrictive terms, and other bullying tactics. News has illegally monopolized the market for "in-store promotions" ("ISPs"). And News has attempted to monopolize the market for "free-standing inserts" ("FSIs"). This anticompetitive conduct has harmed and continues to harm competition, retailers, product manufacturers, everyday consumers, and Valassis.

Faced with detailed factual allegations, including information from other victims of News' anticompetitive conduct, News asks the Court to perform mental gymnastics to avoid finding plausible claims. With a straight face, News first asks the Court to ignore virtually every line of Valassis' Complaint – especially the

---

[1] Unless otherwise specified, "News" refers collectively to Defendants News Corporation, News America Marketing, News America Marketing FSI, LLC, and News America Marketing In-Store Services, LLC.

section entitled "News' Post-Settlement Unlawful Conduct" – based on a deliberate equivocation between facts and claims.  In the event the Court does not take the bait, News then urges the Court to abdicate its responsibilities under Fed. R. Civ. P. 12(b)(6) by considering materials outside Valassis' Complaint, drawing inferences against Valassis, and demanding additional particularized allegations of facts that – before discovery – could only be known to News.  Finally, as a safety net, News asks the Court to punt Valassis' claims to a panel of special masters.  As explained below, News' arguments are meritless and its motion should be denied.

<u>**STATEMENT OF FACTS**</u>

On July 23, 2009, a Michigan jury unanimously found that three of the News defendants engaged in unfair competition and tortiously interfered with Valassis by leveraging their dominance in the ISP market to coerce manufacturers of consumer packaged goods products ("CPGs") to purchase FSIs from them rather than Valassis.  Complaint, Dkt. #1 at ¶4.  The jury awarded Valassis $300 million in damages.  *Id.*  Following the jury's verdict, News agreed to pay Valassis $500 million to settle both that case and a concurrent federal antitrust suit, referred to here as *Valassis I*.  *Id.*  Shockingly, News has continued and expanded its anticompetitive conduct.

**I.   THE ISP AND FSI ARE IN SEPARATE RELEVANT MARKETS.**

This case involves two distinct product markets: the national market for ISPs

and the national market for FSIs. ISPs promote the products of consumer packaged goods manufactures ("CPGs") in the aisle space at supermarkets, grocery stores and other retail stores – they include shelf coupon dispensers, shelf advertising, floor advertising, and shopping cart advertisements.  Dkt. #1 at ¶2.  FSIs, on the other hand, are booklets delivered directly to consumers' homes containing primarily coupons for products manufactured by CPGs.  *Id*. at ¶3.  ISPs and FSIs constitute distinct product markets because they reach and influence consumers in different ways and allow CPGs to engage in different promotional strategies, thereby creating a demand from CPGs for FSIs and ISPs to be sold separately.  *See id*. at ¶¶78-102, 206-235.

## II.    NEWS' ANTICOMPETITIVE CONDUCT IN THE ISP MARKET.

There is little doubt that News dominates the ISP market.  Because the effectiveness of ISPs often turns on a CPG's ability to place ISPs nationally, CPGs are reluctant to contract with an ISP provider unless it can offer access to retailers' aisle space on a national level.  *Id*. at ¶¶95-97, 102.  No other competitor possesses a retailer network comparable to that of News.  *Id*. at ¶¶94, 102.  News has used a number illegal and anticompetitive tactics to prevent competitors from encroaching on its control of retailer aisle space, thereby preventing competitors from building a network of retailers large enough to compete with News in the ISP market (choking off competitors' access to input).  It has also used similar tactics to

prevent competitors from contracting with CPGs (choking off avenues of output).

## A.    News' Tactics with Retailers.

News compels retailers to enter into long-term, exclusive contracts that contain terms designed to eliminate the possibility of competition.  *Id*. at ¶¶116-50.  Based on information from retailers, these contracts include automatic renewal clauses, *id*. at ¶¶122, 124-25, prevent termination except for cause, *id*. at ¶119, and allow News an extraordinary amount of time to cure material breaches, *id*. at ¶¶120-21.  The contracts also include right-of-first-refusal clauses, which News has used to prevent retailers from contracting with ISP providers for products that News does not offer, such as the "Wedge®" and "Video Edge" and "Deal Pop" products.  *Id*. at ¶¶131-50.  And according to retailers, News offers retailers predatory cash payments in order to access their aisle space.  *Id*. at ¶¶106-115.

Making matters worse, News "intentionally staggers the expiration dates of its retailer contracts so that in any given year nearly two thirds of the retailers are unable to contract with a competitor of News."  *Id.* at ¶126.  Though News used its staggering strategy before the parties' 2010 settlement agreement, the Complaint plainly alleges that this practice and its anticompetitive effects have continued since that time.  *See id*. at ¶14(a) (describing post-settlement schemes); *see also id*. at ¶¶103-130 (detailing News present schemes based on information from retailers).  As News' former Executive Vice President of Trade explained:  "this

- 4 -

strategy serves to deter a major competitor from joining the in-store fray" because "any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way."[2]  *Id.* at ¶¶127-28.  Consequently, News has foreclosed competition for approximately 83% of the all commodity volume ("ACV") of grocery stores, 84% of the ACV for drug stores, and 61.2% of the ACV of dollar stores.  *Id.* at ¶186.

### B.    News' Tactics with CPGs.

It's not just Valassis who says News has a monopoly over the ISP market. Major CPGs like Dial, Heinz, Henkel, Foster Farms, Smithfield Foods, HP Hood, BEF Foods, and Spectrum Brands have recently filed a lawsuit in which they make clear that News continues to leverage its ill-gotten monopoly over retailers to compel CPGs into long-term exclusive contracts that also contain anticompetitive terms.  *Id.* at ¶¶23-26, 155-86.  Similar to News' contracts with retailers, its contracts with CPGs are exclusive and extend for long periods of time (as the CPGs themselves state), *id.* at ¶¶155-56, 162-65; are exceptionally difficult to terminate, *id.* at ¶¶157-161; compel CPGs to purchase all or virtually all of their

---

[2] Even though News' former Executive Vice President of Trade made these statements in 2004, News' intent and the anticompetitive consequences of News' conduct are the same.  *Facts* pre-dating the parties' settlement agreement can be used to support a *claim* that accrued after the settlement agreement.  *See* Argument §VIII, *infra.*

- 5 -

ISP requirements from News or else suffer financial penalties, *id*. at ¶¶183-85; and include rights of first refusal that prevent "the CPG from putting its ISP business out for bid or make "it economically unviable for a CPG to also purchase ISPs for placement within a retailer network of News' competitors," *id*. at ¶¶179-82

### C.    News' Other Anticompetitive Tactics.

News does not limit itself to bullying through contracts and prices.  It also uses "a variety of tricks and misrepresentations designed to mislead CPGs and retailers" and to harm Valassis' reputation in the ISP market.  *Id*. at ¶193.  When News loses a retailer contract to Valassis, News will not remove its ISPs from the retailer's aisles.  *Id*. at ¶¶195-97.  Incredibly, News *removes Valassis' ISPs* from the aisles of retailers that have contracts with Valassis.  *Id.* at ¶¶198-200.  Lastly, News misrepresents to CPGs that certain stores are part of its retailer network when in fact they are not to entice CPGS to contract with News rather than Valassis.  *Id.* at ¶¶201-203.

### III.   NEWS' ATTEMPT TO MONOPOLIZE AND RESTRAIN TRADE IN THE FSI MARKET.

News continues to leverage its monopoly in the ISP market to coerce CPGs to purchase their FSIs from News and to award News long-term exclusive, right-of-first-refusal, and requirements contracts.  *Id*. at ¶¶236-284.  According to various CPGs, these contracts are exceptionally difficult to terminate, *id*. at ¶272, include automatic renewal provisions, *id*. at ¶¶267-271, allow for News to commit

multiple breaches, *id.* at ¶¶273-277, and prevent CPGs from putting FSI business out for bid, *id.* at ¶¶278-283.

In addition, "[w]hen CPGs consider purchasing FSIs from Valassis rather than News, News threatens to raise the price the CPGs must pay for News' ISP products." *Id.* at ¶239. News carries out this threat in a number of ways, including revoking discounts and imposing higher prices. *Id.* at ¶¶241-246. Even though certain CPGs would prefer to contract with Valassis for their FSI business, News' financial pressure prevents them from doing so. *Id.* at ¶247. Consequently, Valassis has not been able to win FSI business *despite its lower prices* or higher-quality products. *Id.* at ¶¶263-64. Finally, News still unlawfully bundles FSIs and ISPs, selling FSIs below their incremental costs. *Id.* at ¶¶406-07. And News continues to unlawfully tie purchases of ISPs (the tying product) to purchases of FSIs (the tied product). *Id.* at ¶426.

News' conduct has foreclosed competition in roughly 65% of the FSI market. *Id.* at ¶368. If allowed to continue, News has a dangerous probability of achieving a monopoly in the FSI market as News has already gained substantial market share and the FSI market is highly concentrated with high barriers to competitive entry. *See id.* at ¶371. This illegal anticompetitive conduct must stop.

## IV. NEWS' ONGOING ANTICOMPETITIVE CONDUCT HARMS COMPETITION AND MUST BE STOPPED ONCE AND FOR ALL.

News prefers to view each of its ongoing anticompetitive acts in isolation, as if its dominance in the ISP market has no bearing on choices of retailers and CPGs when it comes time to contract, and as if its ability to leverage its ISP dominance did not impact CPGs' decisions with respect to FSI providers. In truth, News' acts are part of larger, interconnected and cumulative scheme, and have the effect of harming competition in two distinct product markets, all in violation of the federal and state antitrust and unfair competition laws.

News' ongoing conduct has the effect of reducing retailers' and CPGs' choice among ISP and FSI providers, and precludes competition on the products' merits. *Id.* at ¶¶291-324. And News' conduct will allow it to demand supra-competitive prices from both retailers and CPGs once it has eliminated its one true competitor: Valassis. *Id.* at ¶¶298-99, 316-18. The strategies detailed in Valassis' Complaint have increased Valassis' cost to operate, damaged Valassis' business and reputation, artificially affected prices and created artificial barriers to competition. *Id.* at ¶¶19-20.

Notwithstanding News' attempts to dismember and discount Valassis' allegations, Valassis' Complaint contains substantial factual allegations that, taken as true, directly support or lead to plausible inferences as to each element of Valassis' claims. News' motion should be denied.

## LEGAL STANDARD

A complaint meets the pleading standards if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456-57 (6th Cir. 2011). A motion to dismiss under Rule 12(b)(6) must be denied if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).

The pleading standard set forth in *Twombly* and *Iqbal* is not an evidentiary standard. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004-1005 (E.D. Mich. 2010). Nor does it relieve a court of its obligation to "consider the complaint in its entirety" and assess "whether all of the facts alleged, taken collectively," suffice to state a claim. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Even in antitrust cases, courts have "expressly rejected defendants' attempts to read the allegations of the complaint in isolation," and have found "attempt[s] to parse and dismember the complaints[] contrary to

the Supreme Court's admonition that '[t]he character and effect of an [antitrust] conspiracy are not to be judged by dismembering it and viewing its separate parts.'" *In re Packaged Ice*, 723 F. Supp. 2d at 1006 (quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Rather, "even if it strikes a savvy judge that actual proof of those facts is improbable," *Twombly*, 550 U.S. at 556, a complaint is sufficient if it "contain[s] either direct or inferential allegations respecting all material elements of the offense," *Watson*, 648 F.3d at 456-57.  Valassis' Complaint easily satisfies this standard and News' motion must be denied.

## **ARGUMENT**

It is important to note that News' motion depends on its deliberate ignorance of Section III of the Complaint, entitled "News' Post-Settlement Unlawful Conduct."  That Section outlines the strategies that News employed in the FSI and ISP markets *after* the parties settled *Valassis I* to prevent Valassis from gaining any significant foothold in the ISP market.  *See* Dkt. #1 at ¶¶10-41 (describing News' post-settlement schemes).  Valassis then specifically details the ongoing post-settlement conduct undertaken by News in the ISP and FSI markets after Valassis' modest incursion into News' ISP monopoly starting in May 2010 and July 2010.  *See id.* at ¶¶10-11 (stating that Valassis began placing ISPs at SuperValu and Winn-Dixie in May and July 2010, respectively); *id.* at 195-200 (describing News'

refusal to remove its ISPs or removing or damaging Valassis' ISPs); *id*. at ¶¶103-205 (alleging ongoing post-settlement anticompetitive conduct in the ISP market); *id*. at ¶¶236-290 (detailing News' ongoing anticompetitive conduct in the FSI market).   Thus the claims in the Complaint plainly arose post-settlement, as Magistrate Komives has already recognized[3], and News cannot pretend otherwise.

　　To establish a claim under § 1 of the Sherman Act, the plaintiff must allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury."   *Rock v. Nat'l Collegiate Athl. Ass'n*, 928 F. Supp. 2d 1010, 1020 (S.D. Ind. 2013).   The elements of a claim under § 3 of the Clayton Act are similar: (1) the defendant "made a sale on the condition that the buyer not deal in the goods of the sellers' competitors"; (2) "the contract has the effect of substantially lessening competition in the relevant market"; and (3) "the plaintiff was injured in its business or property as a result of the defendant's actions."   *Watkins & Sons Pet Supplies v. Iams Co.*, 107 F. Supp. 2d 883, 899 (S.D. Ohio 1999).   On the other hand, "[a] claim under § 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of

---

[3] In opposition to Valassis' Motion for Expedited Discovery filed in *Valassis I* on the same day the Complaint, three of the News defendants similarly argued the alleged conduct did not arise post-settlement. Magistrate Komives rejected the argument when he granted Valassis' Motion.   *See* Ex. 1, *Valassis I*, Order, Dkt. #429.

that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'"  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002).

Common to claims under all three sections is a showing that the defendant engaged in conduct that restrained trade or unlawfully maintained its monopoly position.  This conduct is meant "to foreclose competition, gain a competitive advantage, or to destroy a competitor."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992).  Predatory pricing, exclusive dealing, bundling and tying are specific types of exclusionary conduct that courts have held to violate the antitrust laws.  In addition, courts have held that tortious conduct may violate the antitrust laws.  *See Conwood*, 290 F.3d at 783-84.  Importantly, the Court must consider the effects of a party's conduct in the aggregate, including cumulative or synergistic effects.  *See Twin City Sportservice, Inc. v. Finley & Co., Inc.*, 676 F.2d 1291, 1302-1303 (9th Cir. 1982) (examining the "overall effects" of a defendant's conduct in the relevant market); *accord Conwood*, 290 F.3d 768 (examining a range of tortious conduct).

Valassis' Complaint contains detailed allegations showing that News engaged in exclusionary conduct before and after the parties' settlement.  First, News monopsonizes the *input* of the ISP market – that is, access to the retailers'

aisle space – through predatory cash guarantees, exclusive long-term contracts with retailers, and right-of-first-refusal clauses.   Dkt. #1 ¶¶103-50.   Second, News monopolizes the *output* of the ISP market – sales to CPGs, the manufacturers and distributors of the products that end up on the retailers' shelves – through long-term and exclusive contracts, schemes to prevent CPGs from using Valassis' retailers, right-of-first refusal agreements for contract renewals, and requirements contracts.   *Id.* at ¶¶151-324. Third, News has attempted to monopolize the FSI market by using is monopoly in the ISP market to obtain FSI contracts through exclusive long-term contracts, right-of-first-refusal agreements, bundling, and tying.   *Id.* at ¶¶236-84.   These are precisely the types of exclusionary conduct that courts have held to violate the Sherman Act and Clayton Act.[4]

## I.   VALASSIS SUFFICIENTLY DEFINES THE RELEVANT ISP AND FSI MARKETS AND PLAUSIBLY ALLEGES NEWS POSSESSES MONOPOLY POWER IN THE ISP MARKET.

"Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. Du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) ("*DuPont*"). While News would prefer to avoid the topic, a meaningful discussion of News'

---

[4] News argues that Valassis' state-law claims (Counts IX to XVI) "fail for the same reasons" as the federal claims.  Dkt. #22 at 49. News' arguments are meritless, for all of the reasons herein.

anticompetitive conduct must begin with a description of the markets in which it is acting and in which it possesses significant power.

### A.      Valassis Alleges Plausible FSI and ISP Markets.

The two relevant markets here are the markets for ISPs and FSIs in the United States. *Id*. at ¶¶78-102, 206-235.  FSIs are "separate and distinct from ISPs and other promotional products in numerous respects …." *Id.* at ¶218.  FSIs possess a number of characteristics that make them unique from other products, *see id.* at ¶¶219(a)-(g), and "[n]o single marketing alternative accomplishes more marketing objectives," *id.* at ¶219(g).  As such, "if the price of FSIs were to rise, CPGs would not significantly alter their FSI strategy."  *Id.* at ¶210.  Hence, there is a low cross-elasticity of demand between FSIs and other forms of marketing, advertising or display efforts. *Id.* at ¶211.  ISPs, on the other hand, possess a number of distinctive features that do not make them reasonably interchangeable substitutes with FSIs and other pre-and-post-purchase promotions.  *See id.* at ¶¶82-85.  ISPs are not reasonable substitutes for FSIs because (among other things) there is demand from CPGs for FSIs to be sold separately from ISPs, and the cost, reach, and effectiveness of FSIs and ISPs differ.  *Id.* at ¶¶217-220; *see also id.* at ¶¶215-218, 221-225.

Valassis' market allegations are substantively identical to the allegations Valassis made in *Valassis I*, and which this Court held were sufficient to withstand

a motion to dismiss.  *See* Ex. 2, *Valassis I*, Report & Recomm., Dkt. #35 at 7-13;

Ex. 3, *Valassis I*, Order, Dkt. #49 at 3 and n.2.  News effectively concedes as

much, devoting a single, conclusory sentence in its 50-page brief to suggest feebly

that Valassis' market and market-power allegations are "inadequate."  The Court

should again reject News' arguments that Valassis has not pled relevant FSI and

ISP markets.[5]

### B.    News Possesses a Monopoly in the Relevant ISP Market.

At the motion-to-dismiss stage, allegations that the defendant possessed

between 60% and 90% of the relevant market and acted to affect prices have been

found sufficient to support an inference of monopoly power.  *See In re Mushroom

Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007); *White

Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 885 (N.D. Ohio 2008)

(finding that an allegation of 70% market share "suffices to overcome a motion to

dismiss alleging lack of monopoly power").  Valassis' allegations of News'

monopoly power in the ISP market are more than sufficient to state a claim.

As set forth in the complaint, News has a "dominant market share" in the

ISP market and there is "no viable competitor to News in the ISP market that

---

[5] In its opposition to Valassis' Motion for Expedited Discovery filed in *Valassis I*,
News argued Valassis failed to allege relevant markets.  Magistrate Komives
necessarily rejected News' arguments regarding market definitions in finding
Valassis had established to good cause to conduct expedited discovery.  Ex. 1,
*Valassis I*, Order, Dkt. #429.

possesses a regional and national retailer network comparable to News' retailer network." Dkt. #1 at ¶94. "In September 2013, News' share of the all commodity volume ('ACV') of grocery, drug, and dollar stores was approximately 83%, 84%, and 61.2% respectively." *Id.* at ¶98. Indeed, "[m]ajor CPGs … agree that News has a monopoly in the ISP market." *Id.* at ¶102.[6] News, moreover, uses its power in the ISP market to affect prices for ISPs and exclude competition. *See, e.g.*, *id.* at ¶¶115, 127-29, 149-50, 167-92. In short, Valassis sufficiently alleges that News has monopoly power in the ISP market.

## II. NEWS' USE OF LONG-TERM, EXCLUSIVE CONTRACTS LESSENS COMPETITION AND UNREASONABLY RESTRAINS TRADE.

"[A]lthough not per se illegal, exclusive dealing arrangements can constitute an improper means of acquiring or maintaining a monopoly." *DuPont*, 637 F.3d at 441. This is particularly true where "the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3rd Cir. 2012). In order to be considered anticompetitive, the exclusive dealing

---

[6] As Judge Borman did in the *Packaged Ice Antitrust Litigation*, 723 F.Supp.2d at 997 n.2, the Court may rely on the factual allegations from the complaint filed in *The Dial Corporation, et al. v. News Corporation, et al.* (Case No. 12-15613) to the extent they are incorporated into Valassis' Complaint. Unlike *Hailes v. Free*, No. 12-00687, 2012 WL 5988726, at *5 (S.D. Ohio Nov. 29, 2012), the complaint in *Dial* contains factual allegations that, taken as true, aver that News committed acts and engaged in practices that support elements of Valassis' causes of action.

arrangement's "probable effect" must be to "substantially lessen competition in the relevant market …." *Id.* at 282.

The Fourth Circuit's decision in *DuPont* provides a guidepost for evaluating News' anticompetitive conduct at the pleading stage.  In *DuPont*, the defendant, Kolon, asserted a counterclaim "that DuPont illegally used multi-year supply agreements with high-volume para-aramid fiber customers."  637 F.3d at 440.  The district court granted DuPont's Rule 12(b)(6) motion, in part, based on DuPont's representations at oral argument that its exclusive contracts affected too small a percentage of the relevant market to be anticompetitive.  *Id.* at 449.  The Fourth Circuit reversed.

After finding that the district court erred in relying on DuPont's representations at oral argument, *id.* at 449, the Fourth Circuit analyzed the sufficiency of Kolon's allegations related to exclusive dealing arrangements.  In particular, Kolon alleged that DuPont, which controlled 70 percent of the relevant market, used multi-year, exclusive contracts "with the highest volume purchasers in the most important commercial sustainable para-aramid categories," and required them "to purchase 80 to 100 percent of their [] requirements from DuPont."  *Id.* at 440, 452.  These contracts "not only limited the overall volume of para-aramid supply available to competition, but [] also severely limited Kolon from competition for the most important customers in categories needed to gain a

- 17 -

foothold for effective competition to DuPont." *Id.* These agreements also contained restrictive terms that made it virtually impossible for Kolon to compete on price. *See id.* DuPont's "anticompetitive conduct [] allowed it to control output and increase prices," and to "constrain[] the only potential entrant to the United States in decades from effectively entering the market, reducing if not practically eliminating additional competition, as well as preserving DuPont's monopoly position." *Id.* The Fourth Circuit held that Kolon's allegations, taken as true with all reasonable inferences drawn in Kolon's favor, were sufficient to survive DuPont's motion to dismiss. *Id.*

The Third Circuit's discussion of exclusive contracts in *ZF Meritor*, 696 F.3d 254, is also instructive. In that case, Eaton was the dominant supplier of heavy-duty transmissions, and ZF Meritor was a competitor. The only direct purchasers for these transmissions were four truck manufacturers. *Id.* at 264. Eaton entered into long-term contracts with all four manufacturers that provided substantial up-front payments if they promised to purchase between 80% and 97.5% of their requirements from Eaton, and mandated repayment if the manufacturers failed to meet the targets. *Id.* at 265. Eaton's contracts further required the manufacturers to give Eaton preferential treatment in the manufacturers' data books – either by excluding competitors from the books or listing Eaton as the standard transmission – which prevented truck buyers from

learning of alternative transmissions. *Id.* Finally, Eaton's contracts required the truck manufacturers to price other suppliers' transmissions at a premium, and to give Eaton a right to match its competitors' prices. *Id.* The Third Circuit had no difficulty finding that Eaton's contracts, though not per se illegal, substantially lessened competition by cutting off competition in all but 15% of the heavy-duty transmission market for long-periods of time, and by impeding competitors' ability to effectively market their products and to compete in terms of price. *Id.* at 286-88. Accordingly, the court held that "there was more than sufficient evidence for a jury to conclude that the cumulative effect of Eaton's conduct was to adversely affect competition." *Id.* at 289.

### A.    News' Long-Term, Exclusive ISP Contracts Are Anticompetitive.

Valassis' detailed allegations amply demonstrate that News' long-term, exclusive contracts in the ISP market are even more anticompetitive than those in *DuPont* and *ZF Meritor*:

- Similar to *DuPont* and *ZF Meritor*, News compels both retailers *and* CPGs to enter into exclusive, long-term contracts, choking both the input and output of the ISP market. Dkt. #1 at ¶¶49, 116, 155-56. News also imposes financial penalties on CPGs who resist News' long-term contracts. *Id.* at ¶165.

- As in *DuPont* and *ZF Meritor*, News' contracts include automatic renewal provisions and allow News to commit repeated material breaches, making them exceptionally difficult for retailers and CPGs to terminate. *Id.* at ¶¶116-25, 155-66.

- Similar to *ZF Meritor*, News makes it economically unviable for CPGs to use another ISP provider. *Id.* at ¶¶168, 173-74; *see id.* at ¶170 ("[I]f News loses a

contract with a regional or national retailer chain, News requires CPGs to substitute another retailer that may not be comparable to the retailer that was lost.").

- Like the contracts in *DuPont* and *ZF Meritor*, News' contracts include terms that virtually eliminate the possibility of competition. News' contracts "obligate the CPG to purchase all or virtually all of its ISPs from News." *Id.* at ¶183. If the CPG refuses, similar to the rebate provisions in *ZF Meritor*, "News imposes a financial penalty on the CPG through increased ISP rates and reduced access to the retailers' aisles," or News "requires the CPG to extend the term of the contract until the CPG satisfies the requirements." *Id.* at ¶¶184-85.

- Similar to *ZF Meritor*, News requires retailers to enter into "right of first refusal" contracts that compel retailers to permit News first rights to sell new products developed by competitors as they come on the market. *Id.* at ¶¶131-150; *see also id.* at ¶¶133-42. As to CPGs, News' right-of-first-refusal clauses "prevent[] the CPG from putting its ISP business out for bid." *Id.* at ¶¶180-81.

- Worse yet, News purposefully staggers its contractual expiration dates for the express purpose of deterring "a major competitor from joining the in-store fray." *Id.* at ¶127. And, just as in *DuPont*, News ensures "that a competitor will not be able to build a sufficiently large network of retailers to be a viable competitor to News, thereby preserving News' ISP monopoly." *Id.* at ¶129.

The result of these exclusionary contract terms, alone or in combination, is that News "forecloses competition in at least 70% to 85% of the ISP market." Dkt. #1 at ¶166. This anticompetitive conduct, like that in *DuPont* and *ZF Meritor*, satisfies the exclusionary conduct prong of Valassis' exclusive dealing claims. This is true notwithstanding News' suggestion that an exclusive contract cannot be anticompetitive unless it is predatory – a suggestion that this Court has already rejected. *See Valassis I*, Order, Dkt. #413 (observing "there is no requirement that exclusive dealing contracts only create an antitrust injury if they involve below-

cost prices"); *see also ZF Meritor*, 696 F.3d at 281 ("Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful").

News' response to Valassis' detailed allegations is to say that Valassis' Complaint is too conclusory because it cites two examples of long-term contracts that existed prior to the parties' settlement agreement and does not include the "who, what, where, when, why and how long," with respect to *all* of News' post-settlement contracts. Yet Rule 8(a)(2) does not require particularized facts and evidentiary examples – like the specifics of each and every contract News has with a retailer or CPG – before discovery to state a plausible claim. *See In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008) (denying motion to dismiss where the complaints, "while not answering all specific questions about 'who, what, when, and where,' d[id] put defendants on notice concerning the basic nature of their complaints … and the grounds upon which their claims exist"). Instead, Valassis must only make plausible allegations based on information and belief that News' contracts contain terms that have effect of excluding competition, *see Whatman, Inc. v. Davin*, No. 08-2103, 2009 WL 6323200, at *4 (D.S.C. Dec. 15, 2009) (attached as Ex. 4), which it has done and has supported with information *directly from retailers, CPGs*, *and News Corp's shareholders*, *see* Dkt. #1 at ¶¶14-16 (alleging post-settlement schemes); *id.* at

¶¶103-50 (providing details regarding post-settlement schemes based on information from retailers); *id*. ¶¶151-86 (providing details regarding post-settlement schemes based on information from retailers); *see also id*. at ¶24 (citing CPGs present allegations of illegal exclusive dealing arrangements) and ¶49 (citing News Corp's own shareholders' 2013 allegations of illegal long-term contracts). And as in *DuPont*, News cannot argue that *all* of Valassis' allegations regarding post-settlement anticompetitive contract terms are rendered conclusory merely because *two* examples of long-term contracts existed before the parties' settlement. *See DuPont*, 637 F.3d at 452-53 (holding that Kolon's allegations of "multi-year contracts" were specific enough to allege exclusionary conduct even though DuPont had produced four contracts with terms of two years or less).  This would require ignoring entire sections of Valassis' Complaint and drawing an inference *against* Valassis, which is inappropriate under Rule 12(b)(6).   *Id*. at 450. Accordingly, Valassis' allegations are more than sufficient at the pleading stage.[7]

---

[7] Notably, News' bland assertions that certain contract terms are "reasonable" or "not anticompetitive" are based on cases that were decided after discovery.  *See, e.g.*, *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) (affirming summary judgment); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995) (affirming summary judgment); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983) (affirming judgment from a bench trial); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981) (reversing judgment from a bench trial). *Cf. ZF Meritor*, 696 F.3d at 287-89 (holding that issues regarding the anticompetitive effects of the contracts at issue were questions for the jury).

## B.   News' Exclusive Dealing Arrangements Substantially Restrain Trade in the FSI Market.

Similar to its conduct in the ISP market, News uses exclusive contracts with CPGs to exclude competition in the FSI market.  As with the ISP market, News has restrained trade and attempted to monopolize the FSI market through long-term, exclusive, right-of-first-refusal, requirements contracts with CPGs.   Dkt. #1 at ¶396; *see also id.* ¶¶265-284 (describing News' exclusive dealing arrangements in the FSI market based on information from CPGs).  These contracts have foreclosed competition in at least 65% of the FSI market.  *Id.* at ¶398.  For the reasons set forth above in connection with the ISP market, Valassis' allegations concerning News' exclusive dealing arrangements in the FSI market are sufficient to withstand a motion to dismiss.

## C.   News' Reliance on *NicSand* is Unavailing.

News argues that because *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007), involved cash guarantees, multi-year contracts, and exclusive contracts, that must mean News' cash guarantees, multi-year contracts, and exclusive contracts are not anticompetitive *as a matter of law*.   News' arguments fail. *NicSand* is so distinguishable that its reasoning supports Valassis, and not News.

First, the *NicSand* court did not announce a general rule that cash guarantees, multi-year contracts, and exclusive contracts can never be anticompetitive.  Unlike this case, *NicSand* was brought by a *former market leader*

that had been unseated by a competitor.  NicSand once held a *67% share* of the market for auto-detailing sandpaper.  It was only in that context that the Sixth Circuit held that 3M's alleged anticompetitive conduct failed to state an antitrust claim.  *See NicSand*, 507 F.3d at 454 (emphasizing that it could not "ignore the demands of the marketplace in which these agreements arose" because "'[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue'").  So the Court's holding was limited and context-specific: "When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury."  *Id.* at 456.  Here, Valassis has never been the market leader in the ISP market – *News* has a stranglehold on the ISP market, and has used its monopoly power to keep Valassis and other competitors from gaining a foothold and to leverage its position in the FSI market.

Second, and perhaps more important, NicSand conceded that the *customers*, not the alleged monopolist, demanded exclusive contracts and cash guarantees.  *Id.* at 447, 456.  NicSand also conceded that "[e]ven after accounting for [3M's up-front] payments … 3M did not engage in any form of predatory pricing ...."  *Id.* at 451-52.  Finally, NicSand admitted that before 3M's allegedly anticompetitive conduct, NicSand was able to earn a startling "38-49% profit margin[]," *id.* at 452, but did not allege that 3M's conduct rendered it unable to compete profitably, at lower profit margins, *id.* at 454.  Essentially, NicSand admitted that it simply *chose*

not to compete with 3M.

In contrast, Valassis alleges that *News*, not CPGs or retailers, imposed the long-term, exclusive contracts, and that *News* used its ISP monopoly power to compel CPGs and retailers to agree to them.  Unlike *NicSand*, Valassis specifically alleges that retailers have expressed that they do not want to be exclusively tied to News for their ISPs, particularly when Valassis offers a range of innovative ISP tactics that News does not.  *See* Dkt. #1 at ¶¶133-142 (describing News' efforts to prevent retailers from contracting with Valassis for its Wedge® product); *id*. at ¶¶143-147 (describing News' efforts to preclude retailers from contracting with Valassis for its "Video Edge," and "Deal Pop" products).  The same is true for CPGs, as underscored by the recent lawsuit by major CPGs against News. *Id*. at ¶23.  They desire to access Valassis' network of retailers in addition to or in lieu of News' network.  *See id*. at ¶¶167-177.  Finally, in sharp contrast to *NicSand*, Valassis expressly alleges that News has engaged in illegal bundling, tying and predatory pricing, *see id*. at ¶¶106-15, 187-92.  As the *NicSand* court recognized, claims by competitors may proceed "when one of the rivals has engaged in some form of predatory pricing or illegal tying . . . ."  507 F.3d at 451.

In short, *NicSand* is not "identical," as News argues, and the distinctions show why this case must proceed.  The *NicSand* court itself emphasized that "should 3M use these contracts and its current market dominance to establish

- 25 -

unreasonable barriers to entry in the future, a potential competitor might have a legitimate antitrust claim." *NicSand*, 507 F.3d at 457.   Here, News is the only monopolist and uses its market position to create barriers to entry and exclude competition, leaving Valassis on the outside looking in.   The Sixth Circuit's holding in *NicSand* does not preclude Valassis' claims.

## III.   NEWS UNLAWFULLY WIELDS MONOPOLY POWER AND SIGNIFICANTLY RESTRAINS TRADE IN THE ISP MARKET USING PREDATORY PRICING.

Predatory pricing supports claims under § 2 of the Sherman Act when (1) "the prices complained of are below an appropriate measure of [the defendant's] costs" and (2) the defendant has "a dangerous probability … of recouping its investment in below-cost prices" after driving out competition.   *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993).   The Sixth Circuit does not require that these elements be proved with certainty, even at the summary judgment phase.   *See Spirit Airlines*, 431 F.3d at 939-40 (reversing summary judgment for the defendant and permitting the plaintiff to proceed to trial where the parties' experts disputed the appropriate measure of costs).   Valassis' Complaint contains more than enough factual matter, taken as true, to state a plausible claim based on predatory pricing.

Valassis alleges specifically that News offers predatory cash guarantees to certain retailers for aisle space in order to prevent the retailers from awarding input

contracts to Valassis.  *Id.* at ¶¶106-115.  Based on information from the retailers themselves, Valassis alleges that News' guarantees "have caused News' incremental cost of the relevant output, ISPs sold to CPGs for placement in those retailers' stores, to exceed News' revenues generated in the sale of those outputs to CPGs."  *Id.* at ¶351.  Retailers "have informed Valassis that News admitted it is losing money based on the high guarantees," "that News is throwing money at the retailer in order to keep the stores and thereby prevent Valassis from obtaining a contract," and that "News' guarantee to the retailer was beyond what any competitor would ever offer the retailer."  *Id.* at ¶¶109-11.  That News' prices are below an appropriate measure of cost can be inferred from the facts specifically alleged.  Hence, Valassis' Complaint contains more than the labels and conclusions that were insufficient to state a claim in *Synergistics USA, Inc. v. Alcon Labs., Inc.*, No. 08-3669, 2009 WL 435299 (S.D.N.Y. Feb. 23, 2009).

Valassis has also adequately alleged there is a "dangerous probability" that News will recoup its investment in below-cost prices.  *Brooke Group Ltd.*, 509 U.S. at 222-24. Once News successfully eliminates attempts at competition in the ISP market, it will recoup the losses it incurred by driving up input prices either by exercising monopsony power over the input and forcing retailers to accept prices below the levels that would prevail in a competitive market, and/or by exercising monopoly power in the output market and raising output prices to monopolistic

levels.   Dkt. #1 at ¶¶114, 299, 352.   Again, these allegations are not mere conclusions.   They are buttressed by statements from retailers that News is "throwing money" at them in the hopes of keeping Valassis and other competitors out long enough to entrench its monopoly and recoup its investment, and by Valassis' detailed allegations of News's scheme to monopolize the ISP market.   *Id.* at ¶¶106-111.

News is therefore flat wrong to say that there "are no facts pled in the Complaint to support" a predatory pricing claim.   Dkt. #22 at 30.   News concedes as much when it acknowledges the retailers' statements that News's prices were predatory.   *Id.* at 32. Instead, News demands additional details that are neither required for purposes of stating a claim under Rule 8(a)(2) nor available to anyone but News prior to discovery. *See Allen v. Dairy Farmers of Am. Inc.*, 748 F. Supp. 2d 323, 346 (D. Vt. 2010) (recognizing that pre-discovery "antitrust allegations often lack a plethora of detail because 'relevant information regarding the conduct of particular defendants is largely in the hands of the alleged conspirators'"); *Whatman*, 2009 WL 6323200, at *4 (observing that "prior to discovery, [plaintiffs] can do no more than plausibly allege upon information and belief, as they have, that [defendant's] prices were below any appropriate measure of its own costs") (attached as Ex. 4).   As such, News' arguments are not persuasive.

Finally, News argues that the predatory pricing scheme is not "plausible"

- 28 -

because News has been doing it since 2009, and thus could not hope to recoup its investment in below-cost prices. *See* Dkt. #22 at 34.   Yet as before, News' plausibility arguments are not fit for the pleading stage.[8]  Further, Valassis' claims are not rendered implausible by the mere fact that News has not recouped its investment *before* eliminating competition in the ISP market.   Nor can News credibly liken this case to *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592 (1986), which was decided *after discovery*, and in which the Supreme Court noted that an alleged conspiracy's "failure to achieve its ends in the *two decades* of its asserted operation is strong evidence that the conspiracy does not in fact exist."  *Id.* (emphasis added).  Two decades is a far cry from a few years, and News' extended commitment to its predatory prices shows only that it is deeply committed to maintaining its monopoly.

In short, Valassis sufficiently alleges that News has engaged in predatory pricing, which supports the element of anticompetitive conduct for Valassis' monopoly claim (Count I) and Valassis' predatory pricing claim (Count II).

## IV.   NEWS USES OTHER ANTICOMPETITIVE CONDUCT TO MAINTAIN ITS MONOPOLY IN THE ISP MARKET.

"'Anticompetitive conduct' can come in too many different forms, and is too

---

[8] *GMA Cover Corp. v. Saab Barracuda LLC*, No. 10-12060, 2012 WL 642739 (E.D. Mich. Feb. 8, 2012), is distinguishable because the alleged predatory pricing scheme was implausible where, unlike this case, the result would have been a monopoly supplier dealing with a monopsony purchaser.

dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Conwood*, 290 F.3d at 784.  In *Conwood*, the court affirmed a jury's finding that the defendant engaged in "a systematic effort to exclude competition from the moist snuff market" through a variety of anticompetitive acts, including removing or disturbing the plaintiff's in-store advertising, providing misleading information to retailers, and excluding competition through exclusive agreements with retailers.  *See id.* at 783.

Similar to *Conwood*, News uses "a variety of tricks and misrepresentations designed to mislead CPGs and retailers" and to harm Valassis' reputation in the ISP market.  Dkt. #1 at ¶193.  When News "loses a retailer contract to Valassis, News will not remove its ISPs from the retailer's aisles."  *Id.* at ¶195.  Yet News *removes Valassis' ISPs* from the aisles of retailers that have contracts with Valassis.  *Id.* at ¶198.  News also "misrepresents that certain stores are part of its retailer network when in fact they are not."  *Id.* at ¶201.  This is precisely the type of tortious conduct the Sixth Circuit recognized as anticompetitive in *Conwood*, and is sufficient to state a plausible claim here.

## V.   VALASSIS SUFFICIENTLY STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION OF THE FSI MARKET.

To establish attempted monopolization under § 2, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving

monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Attempted monopolization occurs when a party employs "methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *M&M Med. Supplies & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992).

### A.    Valassis Alleges Anticompetitive Conduct.

News' anticompetitive conduct in the FSI market is prolific.  News "uses its dominance in the ISP market to make it economically unviable for certain CPGs to give their FSI business to Valassis."  Dkt. #1 at ¶236.  Specifically, "[w]hen CPGs consider purchasing FSIs from Valassis rather than News, News threatens to raise the price the CPGs must pay for News' ISP products."  *Id.* at ¶239.  Valassis alleges *specific examples* of this predatory or anticompetitive conduct:  a CPG told Valassis that "if it gave Valassis its FSI business, News would increase its ISP rates," and that "*even if Valassis' FSI price was lower*, it would not make economic sense to give Valassis its FSI business because of how News' proposal was structured."  *Id.* at ¶251.  And "News told one CPG that its ISP prices would increase by 20% if the CPG no longer ran FSIs with News."  *Id.* at ¶253.  Still another CPG told Valassis that, "*even though Valassis had a lower FSI price*," the CPG was keeping its business with News.  *Id.* at ¶254.  These allegations are more

- 31 -

than sufficient to plead predatory or anticompetitive conduct. *See DuPont*, 637 F.3d at 454 ("Kolon adequately pled DuPont's use of anticompetitive, exclusive agreements with high-volume para-aramid customers. Kolon has therefore cleared the bar as to the first element – anticompetitive conduct.").

### B. Valassis Alleges Specific Intent to Monopolize.

Valassis also alleges facts plausibly demonstrating that News acted with "specific intent to monopolize." *Spectrum Sports*, 506 U.S. at 456. "Specific intent to monopolize may be inferred from anticompetitive conduct ...." *White & White v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 506 (6th Cir. 1983). Here, Valassis alleges that "News' conduct is intended to eliminate competition in the FSI market and achieve a monopoly for News," Dkt. #1 at ¶33, and Valassis supports that allegation with detailed factual allegations of News's anticompetitive conduct, *see* Argument §II.B., *supra*. This is enough to withstand News' motion to dismiss. *See DuPont*, 637 F.3d at 454 ("Kolon alleged various actions undertaken by DuPont over time to protect its dominant market position ... Kolon has therefore sufficiently pled specific intent to monopolize").

### C. Valassis Alleges a Dangerous Probability of Success.

Finally, Valassis alleges a "dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to

consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.* Courts "typically *should not resolve this question at the pleading stage* unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (internal quotation marks omitted) (emphasis added). Valassis' detailed allegations of News' significant market power and the conditions of the FSI market nonetheless are more than sufficient to plausibly plead the "dangerous probability" element.

Valassis and News are the only two providers of FSIs in the United States. Dkt. #1 at ¶231. News presently controls around 65% of the FSI market. *Id.* at ¶234. This market share, in combination with other facts, is enough to infer that a dangerous probability of monopolization exists. *See Broadcom*, 501 F.3d at 318; *In re Pool Prods. Distrib. Market Antitrust Litig.*, 940 F. Supp. 2d 367, 385-87 (E.D. La. 2013) (concluding that the plaintiff plausibly alleged a dangerous probability of monopolization despite the defendant's 33% market share). In fact, "[c]ompelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown." *M&M*, 981 F.2d at 168. Such allegations are present here, *see* Argument §II, *supra*, and Valassis has adequately alleged a dangerous probability of monopolization.

> **D.   News' Request for "Presumptions" Contradicting Valassis' Factual Allegations is Groundless.**

News' only response, based on a materially incomplete statement from the treatise of Professor Areeda and Professor Hovenkamp, is to ask the Court to ignore the well-pleaded facts entirely and instead presume that there is no dangerous probability of monopolization. This argument is flawed for at least two reasons. First, as shown in bold font, News omits the most significant aspect of Areeda's and Hovenkamp's position – the fact that it is based on *evidence*:

> We would find attempt claims presumptively implausible if the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive, **as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share**.

3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶807f at 449-50 (3d ed. 2008). Hence, Areeda's and Hovenkamp's suggested presumption is appropriate only if there is *detailed evidence* of a robust market; it is unfit for the pleading stage.[9]  *See, e.g.*, *Broadcom*, 501 F.3d at 319; *Allen*, 748 F. Supp. 2d at 339 (recognizing that dismissals "at the pre-discovery, pleading stage remain relatively rare"). Second, not only is the presumption inappropriate at the pleading stage as a

---

[9] Professors Areeda and Hovenkamp underscored this point, instructing that "each set of circumstances must be analyzed separately." 3B Areeda & Hovenkamp ¶807f at 450. Not surprisingly, the only cases that News America cites as applying the presumption did so *after discovery* had revealed *evidence* of a robust market notwithstanding the alleged anticompetitive conduct. *See Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 126 (1st Cir. 2011) and *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001).

general matter, it is especially so here in light of Valassis' allegations that a robust market *does not exist*. Stated differently, to accept News' position would require the Court to reject as untrue and construe the well-pleaded allegations *against* Valassis. This flies in the face of the Court's duty to accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in Valassis' favor. *See DuPont*, 637 F.3d at 450. The Court should reject News America's argument for the perversion of the pleading standard that it is.

When construed in Valassis' favor, the detailed facts alleged in the Complaint establish that News engaged in anticompetitive conduct with the specific intent to monopolize the FSI market and that a dangerous probability exists that News will be successful unless stopped. Therefore, Valassis stated a plausible claim for attempted monopolization.

## VI.  VALASSIS STATES VALID BUNDLING AND TYING CLAIMS.

On the same day that Valassis filed this action, it also filed a motion seeking expedited discovery in *Valassis I* in accordance with the Court's June 15, 2011 Order. As is clearly explained in the Complaint, Valassis also asserts claims for bundling and tying in this case because News Corporation ("News Corp") is not a named defendant in *Valassis I*. Dkt. #1 at ¶¶418-21. On February 4, 2013 Magistrate Judge Komives granted Valassis' Motion, finding that there is good

cause for expedited discovery of three of the News defendants' bundling and tying of FSIs and ISPs.  Ex. 1, *Valassis I*, Dkt. # 429.

### A.    Valassis States a Plausible Claim for Bundling Under the Court's Order.

The elements governing the parties' allegations for bundling are set out in the Court's June 15, 2011 Order:

> (a) [A]fter allocating all discounts and rebates attributable to the entire bundle of products to the competitive product, the party charged with bundling sold the competitive product below its incremental cost for the competitive product; and
>
> (b) That the probable effect of the bundled discount is to lessen competition substantially in the market for the competitive product.

*See* Ex. 5, *Valassis I*, Dkt. #412 at A-4 – A-5.

First, Valassis alleges that, after attributing all discounts and rebates associated with News' FSIs and ISPs to News' FSIs (the competitive product), News sells its FSIs below its incremental costs.  Dkt. #1 at ¶407.  Valassis supports this allegation with further detailed allegations concerning News' average FSI billing rate prior to the parties' settlement, its present FSI billing rate, its average FSI costs prior to the parties' settlement, its present FSI costs, and its present FSI rates and costs *after* allocating all discounts and rebates attributable to the entire bundle of FSI and ISP products to FSIs.  *See id.* at ¶¶460-65.  Based on these rates and costs, Valassis alleges News' FSI rates are below its costs. *See id.* at ¶¶465-66.

- 36 -

Taken as true, these allegations support the first element of Valassis' bundling claim.

Second, Valassis alleges facts showing that the probable effect of the discount will be to substantially lessen competition in the FSI market.  Based on its analysis of available information, Valassis cannot offer CPGs a competitive or economically equivalent bundle of FSIs and ISPs.  *Id*. at ¶¶412-13.  This is due to News' actions that have prevented Valassis from obtaining a critical mass of retailers at which Valassis can place ISPs.  *Id*. at ¶¶409-11; *see also id*. at ¶¶106-50.  Because Valassis and News are the only two competitors in the FSI market, *id*. at ¶231, and because the FSI market is characterized by high barriers to entry, *id*. at ¶370, by rendering Valassis unable to compete, News' actions will eliminate competition entirely.  *See Broadcom*, 501 F.3d at 318.  Again, taken as true, these allegations support the second element of Valassis' bundling claim.

News responds to Valassis' detailed factual allegations by pointing to elements of a bundling claim that are not required in the Court's Order and which the Court already rejected.  Namely, News cites *Invacare Corp. v. Respironics, Inc.*, No. 04-1580, 2006 WL 3022968 (N.D. Ohio Oct. 23, 2006), to argue that Valassis was required to allege "below cost [pricing] for the [relevant] market as a whole."  But in adopting the Order's standard governing bundling claims, this Court disagreed and *expressly rejected a market-wide test*.  Ex. 6, *Valassis I*,

Order, Dkt. #413 at 2 ("Defendants would like the test to be applied on a market wide basis. … The Court disagrees.").   News offers no basis for disregarding the Court's previous holding.

Nor does News offer authority for its suggestion that Valassis' attempted entry into the ISP market somehow precludes it from pleading a claim for unlawful bundling. To begin with, Valassis' ability to provide a competitive ISP offering is only relevant to an "affirmative defense to liability" that News can theoretically raise.  *See* Ex. 5 at A-5.  But the burden to plead and prove this "affirmative defense" is on News, not Valassis.  Furthermore, Valassis alleges that it cannot provided a competitive ISP offering – because of News' anticompetitive conduct, Valassis cannot obtain a critical mass of retailers and, therefore, Valassis' ISPs are not a viable alternative to News' ISPs.  *See* Dkt. #1 at ¶¶17-18.  Therefore, News' motion to dismiss Valassis' bundling claim should be denied.

### B.   Valassis States a Plausible Claim for Tying Under the Court's Order.

The essential elements for the tying claim are set out in the Court's June 15, 2011 Order:

> (a) The seller tied the sale of one product to the purchase of a second product by either (i) expressly refusing to sell the tying product except on condition that the buyer also purchase the tied product; or (ii) pricing the tied product, when purchased separately from the other (tying) product, such that, in terms of price and quality considerations, the prospective buyer has no economically practical option other than to participate in the tying arrangement; and

(b) The seller has sufficient economic power in a properly defined product and geographic tying product market to restrain competition in the tie product market appreciably; and either (i) The arrangement affects a substantial volume of commerce in the tied product market such that the foreclosure caused thereby produces anticompetitive effects in that market; or (ii) The arrangement presents a substantial threat that the seller will acquire market power in the tied product market.

Ex. 5, *Valassis I*, Dkt. #412 at A-6.

Contrary to News' argument, Valassis has more than adequately alleged that News has tied the sale of the tied product, FSIs, to the purchase of the tying product, ISPs, by pricing the products such that CPGs have no economically practical option other than to buy them both from News.  Valassis alleges that News "uses its dominance in the ISP market to make it economically unviable for certain CPGs to give their FSI business to Valassis."  Dkt. #1 at ¶236. Specifically, "[w]hen CPGs consider purchasing FSIs from Valassis rather than News, News threatens to raise the price the CPGs must pay for News' ISP products."  *Id.* at ¶239.  Valassis alleges *specific examples* of this anticompetitive conduct.  *See* Stmt. of Facts §III, *supra*; Dkt. #1 ¶¶251, 253, 254.  Coercion can be inferred where an "appreciable number" of buyers have accepted the tie.  *See, e.g., Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977).  In its Order denying News' motion for summary judgment in *Valassis I*, this Court rejected a similar argument by News – that coercion exists only if *all* buyers have accepted the tie.  Ex. 7, *Valassis I*, Order, Dkt. #267 (holding that there are genuine

issues of fact as to "[w]hether News America coerced manufacturers of consumer packaged goods (CPGs) to buy FSIs from News America.").

Valassis' allegations regarding market definitions and market power are more than sufficient to withstand News' motion. *See* Argument §I, *supra*. News once again forgets that this Court already found Valassis' allegations of relevant markets and market power to be sufficient for purposes of tying claims. *See* Ex. 2 at 7, 13. Moreover, "[m]arket definition is a highly fact-based analysis that generally requires discovery." *Foundation for Int. Design v. Savannah College*, 244 F.3d 521, 534 (6th Cir. 2001). And the Court should reject News' attempt to once again use an imagined pleading standard that would require details only available to News and to eliminate all questions of fact.

Valassis' allegations that News' tying arrangement will foreclose a substantial volume of commerce in the FSI market are also more than sufficient. As explained above, there is a substantial threat that News will acquire market power in the FSI (the tied product) market. *See* Argument §V.A.3, *supra*. Valassis has also alleged that the tying arrangement affects a substantial volume of commerce.[10] Here, News' tying arrangements impact countless transactions, *see*

---

[10] The issue is "whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie." *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1130 (6th Cir. 1981). *See RealPage*, 852 F. Supp. 2d at 1227 (finding that two specific instances in
Continued on next page.

- 40 -

Dkt. #1 at ¶432, and have prevented Valassis from winning FSI business on numerous occasions despite Valassis' lower prices, *see id*. at ¶¶247, 249-261. Indeed, News' tie forecloses competition in roughly 65% of the FSI market, *see id*. at ¶¶235, 433, which in 2012 amounted to nearly $467 million worth of FSI page volume, *see id*. at ¶¶230-31, 234-35.[11]   Construing the pleadings in the light most favorable to Valassis, as the Court must, no more is required to survive News' motion to dismiss Valassis' tying claims.

### C.   The Order Does Not Require Dismissal or Stay.

News spends a significant portion of its brief making arguments that prematurely focus on a contorted reading of the Order.  Because these arguments do not deal with the legal sufficiency of Valassis' pleadings, they are irrelevant under Rule 12(b)(6) and should be rejected as such.  In any event, they are wrong.

First, the Order does not bar the parties from filing a lawsuit and seeking a bench trial on bundling and tying claims.  The Order specifically provides that a party "may, *but is not required to*, seek relief from the District Court by way of

---

*Continued from previous page.*

which the defendant exerted market power to effect a tying arrangement were sufficient establish "at least an appreciable restraint on competition" in the tied product market and denying the defendant's motion to dismiss).

[11] Although it is not required to plead around affirmative defenses, *see* note 15, *infra*, Valassis alleges that "[t]he tying effect of FSIs and ISPs does not achieve any efficiency gains that benefit CPGs, such as increased quality, significantly lower costs, or the introduction of new or better products."  *Id.* at ¶434.

motion for further injunctive relief, contempt, *or otherwise*."    Ex. 5 at A-2
(emphasis added).  Therefore, Valassis was not limited to filing a motion in order
to obtain relief under the Order and its bundling and tying claims should be
allowed to proceed.

Second, News argues that Valassis waived its right to a trial by jury on its
bundling and tying claims against News Corp – even though News Corp was not a
party to the Panel Agreement.[12]    According to News, "[b]y its terms, the
Agreement applies to 'any proceedings by the panel or Court relating to such
future business practices.'"  Dkt. #22 at 13.  But the Panel Agreement actually
reads: "The Parties have agreed that the *mutuality provisions set forth in Section 4
of Exhibit A* shall apply to any proceedings by the panel or Court relating to such
future business practices."  Dkt. #22-4 (emphasis added).  That the mutuality
provisions of the Panel Agreement apply to any proceedings has no bearing on
whether the jury waiver applies to any proceedings.  And News has not identified
any circumstances that would warrant application of the jury waiver to News
Corp.[13]

---

[12] Valassis does not dispute that the Panel Agreement prevents it from seeking a
trial by jury against News on its bundling and tying claims.  Instead, these claims
are to be tried by the Court.

[13] News' reference to cases involving non-signatories to contractual *arbitration*
agreements does not compel a different conclusion.  *See* Dkt. #22 at 13.

Third, without citing any support, News incorrectly argues News Corp is not a proper party to this lawsuit. "[T]hrough its executives, including Rupert Murdoch," News Corp "devised, developed, funded, and ultimately approved" the anticompetitive strategies that other News Defendants implemented in the ISP and FSI markets. *See* Dkt. #1 at ¶60; *see also id.* at ¶62. These allegations identify conduct by News Corp that is distinct from the allegations about the conduct of the other defendants and are sufficient to survive a motion to dismiss. *See In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 903-904 (N.D. Cal. 2008)

As an alternative, News asks the Court to punt this entire case to the Panel. But this argument improperly expands the scope of the Court's Order and rewrites the Panel Agreement. The parties agreed, and the Order provides, that that the "antitrust panel may, *at the Court's sole discretion*, also advise the court regarding ongoing disputes under this Order, and the *Court may appoint* the members of the panel as Special Masters, as appropriate, to assist in resolving any such disputes." Ex. 8 at Ex. A, ¶6; Ex. 5 at ¶6 (emphasis added). The Panel does not automatically decide the legality of News' conduct. The parties, moreover, did not agree, and the Order does not provide, that the Panel would review *all* of the parties' future claims – the Order not does operate to waive Valassis' right to a jury trial on new and different claims that it never agreed to refer to the Panel. Nor did the parties

agree that Valassis must forsake *all* other claims until *after* its bundling and tying claims are decided. Moreover, News offers no support for its assumption that punting this case to the Panel will offer any meaningful efficiency.[14] Therefore, News has not demonstrated that it is entitled to either a stay or dismissal.

## VII.   VALASSIS SUFFICIENTLY ALLEGES ANTITRUST INJURY.

News' argument that Valassis has not plausibly alleged antitrust injury disregards major portions of Valassis' Complaint. *See, e.g.,* Dkt. #1 at ¶¶ 30-36, 236-284, 291-335 (alleging injury to competition harming CPGs, retailers and consumers, and antitrust injury to Valassis). Antitrust injury is "(1) injury of the type the antitrust laws were intended to prevent and (2) injury that flows from that which makes defendants' acts unlawful." *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 284 (6th Cir. 2014) (quoting *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003)). News' exclusionary conduct causes precisely the type of injury that the antitrust laws were intended to prevent, and Valassis' injury flows directly from "that which makes [News'] acts unlawful."

Valassis alleges that News has used its monopoly power in the ISP market either (1) to coerce CPGs into purchasing FSIs from News that they would otherwise prefer to purchase from Valassis or (2) to predatorily sell FSIs below an

---

[14] The Panel's conclusion as to bundling and tying will have no impact on the jury's determination of whether those same contracts violate other antitrust and state laws or the propriety of News' contracts with retailers.

appropriate measure of incremental costs. *See* Dkt. #1 at ¶¶30-36, 236-284, 308, 316, 321. This conduct prevents Valassis from competing with News on the merits, reduces choice for CPGs, and has increased Valassis' operating costs or caused it to lose FSI business. *Id.* at ¶¶25-26, 326, 329, 332, 334. When viewed as a whole and in the light most favorable to Valassis, Valassis' Complaint plausibly alleges not only injury to competition, but also injury to Valassis that flows from News' unlawful conduct. *See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010); *Suture Exp., Inc. v. Cardinal Health 200, LLC*, __ F. Supp. 2d __, 2013 WL 3991798 at *7 (D. Kan. 2013) (holding allegations that a tying arrangement, *inter alia*, "reduced the level of competition" and "limit[ed] a customer's choice" were "sufficient to allege an antitrust injury") (attached as Ex. 9).

News' significant market power in the ISP market has allowed it to secure from retailers long-term, exclusive contracts with highly restrictive terms and staggered expiration dates, thereby restricting competitors' access to retailers' aisle space (a necessary input for selling ISPs to CPGs). *See* Dkt. #1 at ¶¶116-50. This conduct reduces competition in the ISP market by preventing News' competitors from gaining a critical mass of retailers necessary to compete for sales of ISPs to CPGs. Similarly, in *ZF Meritor*, the Third Circuit held that the jury could properly find that Eaton's long-term agreements "unlawfully foreclosed a substantial share

of the HD transmissions market, which would otherwise have been available for rivals," which caused antitrust injury to ZF Meritor:  "A jury could certainly conclude that Plaintiff's inability to grow was a direct result of Eaton's exclusionary conduct."  696 F.3d at 289.  Similarly, in *Conwood*, the Sixth Circuit had no difficulty concluding that defendant's alleged anticompetitive dirty tricks, which made it more difficult for the plaintiff to compete, resulted in higher prices and reduced consumer choice, and caused antitrust injury to the plaintiff.  *See Conwood*, 290 F.3d 790-91.

News has used highly-restrictive and long-term, exclusive agreements, on top of dishonest and destructive actions, to impede competitors' ability to compete with News in terms of price and quality for ISP customers.  Dkt. #1 at ¶¶325-35. Valassis' allegations, taken as true and construed in the light most favorable to Valassis, are sufficient to establish antitrust injury in this case.

## VIII.  NEWS MISREADS THE SETTLEMENT AGREEMENT.

Consistent with its overall strategy to avoid the still-liberal pleading standard, News suggests that the Court may ignore many of Valassis' factual allegations because some of them might relate to events that occurred before the parties' February 4, 2010 settlement agreement.  This position is nonsense.

First, News' motion is based on Rule 12(b)(6), which precludes the Court from considering materials outside the pleadings unless the Court converts the

motion to one for summary judgment under Rule 56. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011) (citations omitted); *see also DuPont*, 637 F.3d at 450. Since there is no question that the settlement agreement is not a part of Valassis' Complaint, it has no bearing on the legal sufficiency of Valassis' claims, and should not be considered on a motion to dismiss.[15] *See DuPont*, 637 F.3d at 450; *accord Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689, 698 (E.D. Ky. 2012).

Second, even if the Court could consider the settlement, it does not have the effect that News thinks it does. To be crystal clear: *the claims asserted in the Complaint accrued after the settlement agreement*. *See* Dkt. #1 at ¶¶10-41. This, however, does not mean that facts that existed before the settlement agreement are not relevant to those post-settlement claims. Indeed, in their Report and Recommendation, which this Court adopted, the Panel specifically recognized that "[i]f evidence of past conduct or previous judicial findings are relevant in future disputes, either party can offer them in evidence." Ex. 10, *Valassis I*, Report & Recomm., Dkt. #403 at §IV.C.; Ex. 6, *Valassis I*, Dkt. #413,

The problem with News' argument is that it deliberately confuses facts and claims. A release does not bar the use of *facts* existing prior to the date of the

---

[15] Moreover, release is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and parties are not required to plead around affirmative defenses. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

release to support a *claim* that accrued after the release was executed.  *See Cotton v. City of Franklin*, 494 F. App'x 518, 522 (6th Cir. 2012).  The Sixth Circuit cogently explained the difference in *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 454 (6th Cir. 2011), where the defendants argued, as News does here, that a 2007 settlement agreement precluded the plaintiff from alleging a present Sherman Act violation based on allegations that the defendants entered into their conspiracy in 1998, even though acts in furtherance of the conspiracy occurred after the settlement agreement.  The Sixth Circuit explained:

> **This reasoning is faulty because it overlooks the difference between facts and claims.  Although some of its predicate facts occurred before 2007, the 2007 *claim* did not exist at the time of the settlement.**  Because Watson Carpet was not injured from the 2007 refusal to sell until the refusal to sell occurred, the 2007 claim accrued after the parties signed the settlement and release.

*Id.* at 460 (emphasis added).[16]  As in *Watson Carpet*, Valassis' claims accrued after

---

[16] Based on *MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*, 161 F.3d 443, 448-49 (7th Cir. 1998), News asserts that "the released claims include any claims relating to contracts, conduct and practices that were in place as of the date of the settlement agreement, even if they continued after that date."  Dkt. #22 at 8 n.3.  In *Watson Carpet*, however, the Sixth Circuit found that *MCM* "offered too little reasoning on the issue for its conclusion to persuade us."  *See Watson Carpet*, 648 F.3d at 461.  Further, News' attempt to reinterpret the release as some carte blanche license for pre-existing practices is absurd.  Indeed, it was the illegality of those preexisting practices that led the Court, as part of the settlement, to enjoin continued unlawful bundling and tying and to establish procedures for addressing continued violations.

the release even though some of the facts supporting the claims occurred prior to the release.  News cannot legitimately argue that such factual allegations can be disregarded.  Finally, given that Valassis' alleges that the majority of News' conduct began after Valassis began placing ISPs in May and July 2010, the operative allegations plainly occurred after the parties' February 2010 settlement agreement.  *See* Dkt. #1 at ¶¶10-11; *id.* at ¶¶103-205 (alleging ongoing post-settlement anticompetitive conduct in the ISP market); *id.* at ¶¶236-290 (detailing News' ongoing anticompetitive conduct in the FSI market).

## IX.  ALTERNATIVELY, VALASSIS REQUESTS LEAVE TO AMEND THE COMPLAINT.

Though Valassis' arguments establish that News' motion should be denied, Valassis alternatively requests that it be granted leave to amend if the Court determines that the Complaint is deficient in any respect.  Leave should be granted freely in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, … undue prejudice to the opposing party by virtual of allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a)(2).

To the extent the Court grants News' motion Valassis will be prepared to file an amended complaint without delay, and there is no suggestion of bad faith or dilatory motive in this case.  Nor will News be prejudiced if the Court permits an amendment: this case is at the pleading stage, no scheduling conference has taken

place, no scheduling order has been issued, and no trial date has been set. *Cf.*

*Morse v. McWhorter*, 290 F.3d 795, 800-01 (6th Cir. 2002). Finally, News'

motion to dismiss was largely based on its feigned confusion over when the events

in the Complaint took place and other supposed omissions of detail, and it has not

demonstrated that Valassis would be unable to state a claim if these perceived

defects were corrected. Thus, an amendment will not be futile. *See Rose v.*

*Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). Accordingly,

to the extent the Court grants any part of News' motion, Valassis should be granted

leave to amend its Complaint.

## CONCLUSION

For the reasons set forth above, News's motion should be denied.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK &          THE MENDELSON LAW FIRM, PC
STONE, PLC

By: /s/ Kimberly L. Scott                          David S. Mendelson (P53572)
    A. Michael Palizzi (P47262)                  355 S. Old Woodward Ave., Ste. 100
    Thomas W. Cranmer (P25252)            Birmingham, MI 48009
    Larry Saylor (P28165)                          (248) 646-8277
    Kimberly Scott (P69706)
    150 W. Jefferson, Suite 2500
    Detroit, MI  48226
    (313) 963-6420

February 14, 2014

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 14, 2014, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will serve all counsel of record.

Respectfully submitted,

 /s/Kimberly L. Scott
MILLER CANFIELD PADDOCK
and STONE, P.L.C.